UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA,       ;

                Plaintiff,       :

          -against-        :      11 CR 349 (LAP)

ERICSON VARGAS CARDONA,     :

              Defendant.     :

-------------------------------------------------------------x

_____

**DEFENDANT'S SENTENCING MEMORANDUM**
_____

David Wikstrom, Esq.
Attorney for *Ericson Vargas Cardona*
*Woolworth Building*
233 Broadway, Suite 2208
New York, New York 10279
(212) 248-5511

**INTRODUCTION**

This Memorandum is submitted in connection with the sentencing of Ericson Vargas Cardona. Mr. Vargas pleaded guilty on April 14, 2015 to Count One (importation of narcotics) in violation of 21 U.S.C. §§ 812, 959(a), 960(a)(3) and 960(B)(1)(b)(ii), and to Count Three (using and carrying an assault rifle in connection with drug trafficking) in violation of 18 U.S.C. § 924(c). He faces mandatory minimum terms of 10 years' imprisonment on each of those counts, which must be served consecutively.[1] His Guidelines imprisonment range under Count One is 324-405 months, and under Count Three is 120 months. (*See* PSR, ¶ 60.)

The Probation Department's recommendation places Mr. Vargas in the guidelines stratosphere: 420 months' imprisonment.[2] Given the scope and duration of the violent crimes committed by the Oficina de Envigado (hereinafter "Oficina") and its members during the relevant time period, the recommendation is understandable. But for a number of reasons, it would be wrong to follow it. The crimes of violence that drive the recommendation are not charged in this indictment. Mr. Vargas's extradition was neither sought by the United States, nor granted by Colombia, with respect to them; indeed, Mr. Vargas continues to have legal exposure for any such conduct in Colombia. Furthermore, and perhaps more importantly, to focus on that

---

[1] I have reviewed the Presentence Investigation Report ("PSR") dated July 9, 2015 with my client; we have no objection to its content or its Guidelines calculation.

[2] Ironically, and perhaps unintentionally, this represents a below-Guidelines sentencing recommendation.

conduct, detached from reference to the criminal organization of which Mr. Vargas was a part, and likewise detached from reference to the larger forces which catalyzed its criminality and violence—a focus not similarly brought to bear on Mr. Vargas's predecessors and bosses in the Oficina, to say nothing of the myriad criminal organizations which for decades waged war against it for control of drug trafficking routes and territory—would be unfair.  These brutal wars, endemic to Colombia, were waged with murder, kidnapping, torture, forced disappearances, rape and displacement. They were often waged with the complicity of Colombian military and Colombian law enforcement, and although the protagonists nominally battled each other, they victimized ordinary citizens, farmers, trade unionists, human rights advocates, religious leaders and politicians. The wars raged before Mr. Vargas was born, they raged when Mr. Vargas was a child in the slums of Medellin, they raged as he grew up and was recruited as the driver and bodyguard for Carlos Mejia Aguilar (a/k/a "Rogelio"), they raged as, one-by-one, the Oficina leaders surrendered (or were captured and extradited) to the United States, and they continue to rage today.

As set forth below, the difficult questions raised by these cases have in large part already been cabined by charging decisions of U. S. Attorney's Offices. Most similarly-situated defendants have been offered cooperation agreements, so that the impact of prior violent crimes has been muted by subsequent assistance to law enforcement, and the written materials submitted in connection with sentencing kept under seal. In this District, the exception is the case of Diego Murillo Bejarano (a/k/a "Don Berna"), 03 CR 1188 (RMB), where the U. S. Attorney's Office offered

a guilty plea to a drug count alone, and where, in connection with Berna's uncharged crimes of violence, the Government formally <u>opposed</u> recognition of the rights of victims under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. §3771.[3] I hasten to add that this is <u>not</u> intended as criticism: offering cooperation agreements to the leaders of drug trafficking organizations makes sense because they have a wealth of important information that law enforcement benefits from, on the one hand, while sentencing non-cooperating Colombian defendants based upon uncharged and unconvicted crimes of violence would raise numerous and difficult questions of proof, of relatedness, of sentencing disparity and of comity, on the other.  What I seek on Mr. Vargas's behalf, therefore, is consistency of approach: that the Court weigh these factors under § 3553 and impose a sentence that provides just punishment, but which also avoids unwarranted sentencing disparity between his case and that of comparable defendants, as discussed *infra*.

Based on the arguments which follow, and the letters from Mr. Vargas's family that are transmitted herewith, I will ask your Honor on the date of sentencing to impose the minimum authorized term of imprisonment: 20 years. Such a sentence will be "sufficient, but not greater than necessary" to meet the objectives of criminal sentencing under 18 U.S.C. § 3553(a).

---

[3] Berna's victims' unsuccessful application to intervene under the CVRA was later affirmed by the Second Circuit, *see In Re Rendon Galvis,* 564 F.3d 170 (2d Cir. 2009).

**STATEMENT OF FACTS**

To understand how Mr. Vargas's affiliation with the Oficina originated, and to place his case in context with several related Southern District prosecutions, some brief historical stage-setting is necessary. Specifically, this introduction must include background information concerning Pablo Escobar, the AUC, and Don Berna.[4]

### Pablo Escobar

Pablo Escobar rose from obscurity and street-level criminality in Medellin to become the head of the Medellin Cartel. At its height during the mid-1980s, Escobar's cartel was responsible for upwards of 80% of United States cocaine supply, shipping multiple tons of cocaine from Colombia to the United States per day, earning by some estimates over $20 billion annually, and making Escobar one of the world's richest persons. Escobar was a flamboyantly vicious trafficker and murderer, who publicly cultivated a Robin Hood image by funding the construction of sports fields, schools, hospitals and churches in and around Medellin, while simultaneously corrupting and/or killing countless political figures, judges, prosecutors, police officers, journalists, witnesses and rivals. He murdered thousands of people, including hundreds of police officers, going so far as to publicly offer a bounty for the dead body of any policeman. Escobar is believed to have been responsible for the murder, in 1989, of Luis Carlos Galan, one of three Colombian presidential candidates assassinated that year, as well as the bombings of an Avianca airliner and DAS

---

[4] As the Court has already presided over Rogelio's sentencing proceeding, much of this is likely familiar ground, and will be presented in summary form here.

headquarters in Bogota. In the early 90s, Escobar's exploits helped make Medellin the world's murder capital, with 25,000 murders in 1991 and 27,100 murders in 1992 (*see* Inter-American Commission on Human Rights, Ch. II, *The Violence Phenomenon, available at* http://www.cidh.org/countryrep/colombia93eng/chap.2.htm).

### The AUC

Meanwhile, in the Colombian countryside─where law enforcement presence was virtually non-existent─landowners formed private armies to protect themselves from kidnappings, extortions and murders perpetrated by leftist guerrillas. Originally known by the acronym MAS (Muerte a Secuestadores), these private armies, numbering in excess of 30,000 armed soldiers, eventually became known as the AUC (Autodefensas Unidas de Colombia), and operated throughout the country, divided into numerous factions. The founders of the AUC were the Castano brothers, Fidel, Carlos and Vicente, whose father, Jesus, had been murdered by Marxist guerrillas in the 1980s. Vicente Castano's right-hand man and chief assassin was Hebert Veloza ("HH") (*see United States v. Veloza Garcia,* 07 CR 274 (WHP)). Although originally formed as private militias with (initially, at least) the explicit approval and support of the Colombian government, the AUC ultimately proved to be simply a vast, right-wing paramilitary death squad, supporting itself with the very drug trafficking, kidnappings and murders they had been formed to defend against. (In this, the AUC perhaps outdid Escobar, as by some accounts AUC victims number in excess of 140,000.) Throughout Colombia, and working in tandem with military and law enforcement officials, the AUC controlled not just drug trafficking, but also elections,

5

installing mayors, governors and members of the national congress. In 2001, the AUC was designated a terrorist group by the United States, based on its use of "violent means to maintain total control and to protect their significant sources and supplies of cocaine." (*International Narcotics Control Strategy Report*, U.S. Department of State (2006) (Ex. 3); *International Narcotics Control Strategy Report,* U.S. Department of State (2007) (Ex. 4)).

### Don Berna

And lastly, Don Berna. The Moncada and Galeano families were traffickers who were part of Escobar's Medellin cartel. Don Berna (*see United States v. Bejarano*, 03 CR 1188 (RMB)) was an assassin who headed the Galeanos' security apparatus. In 1992, however, Escobar summoned the heads of the Moncada and Galeano families to a meeting[5], at which he personally executed them, ostensibly over a drug debt. Following the murders of his bosses by Escobar, Don Berna teamed up with the Castano brothers of the AUC to organize "Los Pepes," or "**Pe**rseguidos por **P**ablo **Es**cobar." This armed militia combined Medellin traffickers, rural paramilitaries, members of rival cartels and members of Colombian law enforcement. In unison, the Pepes waged war against every part of the Escobar organization. Through murders, bombings, kidnappings and torture, the Pepes were ultimately successful in toppling Escobar from power and flushing him out, enabling Colombian police to find and

---

[5] The meeting was convened in a prison that the Colombian government constructed according to Escobar's specifications, to accommodate Escobar himself during his service of a Colombian prison term. Escobar was also permitted to choose the guards. Following his 1992 assassination of the Galeanos, he somehow escaped.

execute him in December 1993. Thereafter, Don Berna assumed control of the remnants of Escobar's organization and extensive contacts, and the Oficina de Envigado was born. And much as the AUC had done in the countryside—trafficking in drugs, collecting drug debts, mediating conflicts, and enriching itself through the very predations it had originally been formed to combat—so Don Berna did in Medellín through the Oficina. Under Don Berna's leadership, it regulated drug trafficking, mediated disputes, and collected drug debts, utilizing means and methods largely indistinguishable from those Escobar had used previously.

## **OFICINA DE ENVIGADO, AND THE OFFENSE CONDUCT**

From the early 1990s until 2005, under Don Berna's leadership, the Oficina became a drug trafficking organization known more for its debt-collection and violence than for the scope of its narcotics activity.  Its leadership was drawn principally from the ranks of law enforcement and from AUC personnel, while its lower ranks were filled by young men recruited from Medellín slums. Don Berna's principal lieutenants were Carlos Mario Aguilar ("Rogelio") (*see United States v. Aguilar, Dkt. No. unknown*) and Daniel Alberto Mejia ("Danielito")[6]. Rogelio's right-hand man was Mauricio Lopez ("Yiyo") (*see United States v. Cardona,* 09 CR 156 (PGG)).  Yiyo recruited both Maximiliano Bonilla Orozco ("Valenciano") (*see United States v. Orozco,* 08 CR 140 (SLT) (E.D.N.Y.)) and Mr. Vargas.

In 2005, Don Berna was imprisoned in Colombia as part of the demobilization process in Colombia.  Thereafter, Rogelio assumed control of the

---

[6] Danielito was murdered in 2006.

Oficina. Mr. Vargas became Rogelio's right-hand man, driver, and bodyguard. Valenciano was in charge of the Oficina's drug trafficking activities, gaining control of the ports of Barranquilla, Cartagena and Santa Marta on the northern coast of Colombia, and investing in multi-ton shipments of narcotics through Mexico to the United States. The government has estimated that those shipments exceeded 45 tons of cocaine, from which Valenciano earned over $28 million dollars. Mr. Vargas, in Medellin, was Rogelio's principal lieutenant, subordinate both to him and to Yiyo; the crimes Mr. Vargas committed for the Oficina, as identified in the PSR, were done at the direction of Rogelio or Yiyo (or both).  Mr. Vargas also maintained ties with Oficina-affiliated Medellin street gangs, which committed numerous local crimes, such as robbery, kidnapping, extortion, and so on, but which also trafficked cocaine (on a vastly smaller scale); that cocaine was processed in a laboratory owned by Mr. Vargas. Furthermore, in 2009, Mr. Vargas invested $40,000 in a drug shipment originating in Colombia destined for the United States (through Mexico), which was successful, and from which Mr. Vargas doubled his investment.

## ARGUMENT

In imposing sentence on Mr. Vargas, the Court will not be writing on a blank slate. This is so because all of the persons named above (who are still alive), including each of Mr. Vargas's predecessors and superiors in the Oficina, have been prosecuted, or are currently being prosecuted, in the Southern District of New York.[7]

---

[7] Other than *United States v. Orozco ("Valenciano")*, 08 CR 140 (SLT)(E.D.N.Y.), as noted above.

Furthermore, there are analogous cases from the Eastern District of New York and the District of Columbia. (Candidly, though, not many, for the vast majority of these cases—i.e., cases involving Colombian traffickers, with leadership enhancements, and with uncharged crimes of violence—were resolved after the respective defendants were offered cooperation agreements, an offer that was not made to Mr. Vargas.[8])

Other than Don Berna, each of the Oficina bosses ████████████ ████████ Don Berna's extradition to the United States took place in May 2008. Two months later, in July 2008, Rogelio surrendered and was extradited to the U. S. ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ █████████████████ ████████████████████████████████████████ ███████████████████████████████████ █████████████████████████████

The most analogous case for sentencing purposes, therefore, *i.e.*, an Oficina leader sentenced without a cooperation agreement, is the closely-related SDNY prosecution of Don Berna. As already noted, Don Berna was the founder and leader of the Oficina. He was a ruthless and indiscriminate killer, and many of his exploits involved torture, decapitations, and the like. According to papers filed by the

---

[8] ██████████████████████████████████████████████████████████

[9] Whereupon Valenciano promptly returned to Colombia, resumed trafficking and sparked an internecine war with Mr. Vargas that persisted until his capture in 2011.

government in connection with Don Berna's 2009 case, the number of his victims exceeded 13,000.  (US v. Murillo-Bejarano, 03 CR 1188, Government Memorandum in Opposition to recognition of victim's rights under CVRA, Document 65, filed 2/27/09, at p. 3: "If Ms. Rendon's construction of the CVRA were correct, the Court would have to hold a mini-trial to determine not only whether the defendant was responsible for her son's murder but how, if at all, that murder was related to the defendant's drug trafficking offense.  Indeed, the Court may have to do so for all similarly situated claimants---a group that by IHRA's count may number in excess of 13,000 people.")[10]

Don Berna's plea involved the 10-year minimum under 841(b)(1)(A), but also the functional equivalent of a much longer minimum, a binding Guidelines sentencing range of 324-405 months, from which he agreed not to seek a departure. In other words, he was offered a plea to a 27-year mandatory minimum term, and was in fact sentenced in the middle of that range, to a term of 375 months.  And there is no comparison between Don Berna and Mr. Vargas: as the Government noted in its Sentencing Memorandum, Don Berna imported "numerous metric tons of cocaine into the United States…..was the *de facto* leader of a terrorist and paramilitary organization which numbered in the thousands [and] commanded

---

[10]  The USAO noted that drug-related murders were a mere subset of the various categories of murder-worthy activity presided over by Don Berna, which included fighting the Oficina's political enemies, personal retaliation, "social cleansing," elimination of informants, and various other nefarious but unrelated criminal ventures.

thousands of armed paramilitaries as part of his narcotics trafficking."  (*Id.*, pp. 18-19.)[11]

A more recent analog is the case of Rodrigo Tovar-Pupo, a/k/a "Jorge 40." (*United States v. Tovar-Pupo*, 04 CR 114 (RBW) (D.C.)). Tovar-Pupo was the commander of the AUC's Norte Bloc, consisting of 4,500 armed "soldiers." According to the Government's application for pretrial detention, Colombian government investigators have linked Tovar-Pupo's troops to 768 forced disappearances and 200 massacres. As part of the Colombian Peace and Justice proceedings, occurring prior to his extradition, he confessed to over 600 crimes, including the forcible disappearance of seven government investigators, the massacre of forty fishermen, and a campaign to execute union leaders in Northern Colombia. Tovar-Pupo's Guidelines specified life imprisonment, based on a total offense level of 43; the Government recommended a sentence of 360 months. (Government Sentencing Memorandum, 04 CR 115 (RBW)(Doc. 476), at pp. 12-14.) On November 6, 2015 Judge Walton sentenced him to 198 months' imprisonment. (*Id.*, Doc. 532.)

There are, to be sure, numerous cases, both pending and concluded, involving defendants with comparable backgrounds and offense conduct. In this category, I would call the Court's attention to:

███████████████████████████████████

---

■ ████████████████████████████████████
████████████████████████████████████████



---

[12] According to IHRLC
(https://www.law.berkeley.edu/files/IHRLC/Truthbehindbars.pdf)
It was the report of the IHRLC on which the Government relied, in part, in connection with
Don Berna's 2009 sentencing.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████

There is nothing improper about these dispositions. Nor does the fact that those defendants were offered the opportunity to enter into cooperation agreements confer any right on the part of Mr. Vargas to demand leniency for himself despite the fact that he was not afforded the same opportunity. On the other hand, I think that considerations of fairness and proportionality, as well as the <u>appearance</u> of fairness and proportionality, are particularly important in an instance like this, where ████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████ where their culpability, both moral and legal, is equivalent; yet their sentences dramatically lower. In these circumstances, I submit, it is particularly important for the Court to honor the command of § 3553(a)(6) to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

In this case, accordingly, the most relevant sentences to consider (since they did not involve a §5K1.1 motion) are the sentences imposed on Don Berna (375 months) and Tovar-Pupo (198 months). In Don Berna's case, the government

13

recommended a sentence of 405 months—notably, <u>lower</u> than the Probation Department's recommendation for Mr. Vargas—based "primarily on the enormous quantity of cocaine [he] imported into the United States. . .as well as his leadership position within a terrorist and paramilitary organization in Colombia." (Gov't Sentencing Memorandum, 03 CR 1188 (RMB), Doc. 39, p. 2). The Government simultaneously argued <u>against</u> recognition of the rights of his murder victims to intervene and be heard in connection with the sentence (*Id.*, Doc. 65). In short, there is simply no comparison between Mr. Vargas and Don Berna. And there is also no comparison between Mr. Vargas and Tovar-Pupo, who commanded a terrorist army of 4,500, who was responsible for more than 200 massacres, and who merited, in the Government's sentencing argument, a sentence of 360 months based "on the extraordinary amount of cocaine for which he [was] accountable, as well as the critical leadership position [he] held in the AUC." (*See* 04 CR 114 (RBW)(D.C.), Gov't. Sentencing Memorandum, Doc. 476, at p. 1.)[13]

The 20-year (or 240-month) mandatory term in Mr. Vargas's case, the least the Court can impose, is therefore an appropriate sentence for this defendant. To begin with, he is far less culpable than Don Berna, who was the founder of the Oficina, who was responsible for the importation of many <u>tons</u> of cocaine to the United States, and whose victims number, according to the Government, in excess of 13,000.

---

[13] It should also be noted that that sentencing recommendation, which the court did not follow, was based in part of Tovar-Pupo's lack of acceptance of responsibility, which he had forfeited by filing frivolous motions to withdraw his plea on the grounds of innocence. Notwithstanding the 30-year recommendation, and the defendant's lack of acceptance of responsibility, the court imposed a 198-month term.

He was the leader, for more than two decades, of more than one violent, narcotrafficking entity (Oficina and AUC), and involved in narcotics trafficking and violence for more than three decades.  We do not context the leadership enhancement in Mr. Vargas's case (PSR ¶26), but Mr. Vargas was not, as the Probation Department writes (PSR Recommendation, p. 15) "the leader of the Oficina" from 2000 through 2012. The leaders of the Oficina were Don Berna, Daniel Mejia (who was killed in 2006), Rogelio, and Yiyo; when Mr. Vargas became the "leader" in 2008, it was by virtue not of ascension, but of attrition, as each of the Oficina's prior leaders was imprisoned, dead, or ███████████████████ ████████████ Most of Mr. Vargas's attention during the next three years, prior to his 2012 arrest, was focused on hiding from law enforcement, and hiding as well from Valenciano, who was waging war against him (████████████████████ ████████████████████ And while it is also true that numerous weapons were stored at the farm where Mr. Vargas was captured, those weapons were Oficina weapons, having been acquired over time by each of aforementioned Oficina leaders.

A sentence of 20 years' imprisonment is shorter than the 31 years meted out to Don Berna, but in light of the vast difference in culpability between them, a shorter sentence for Mr. Vargas is reasonable. Notably, it would also be longer than the 16-year sentence meted out to Tovar-Pupo, though by any measure Tovar-Pupo—who imported tons of cocaine, whose terrorist army killed hundreds and hundreds of people and who, even on the day of sentence, had yet to accept responsibility for his offenses—is a more significant violator.

The mandatory minimum term is therefore the reasonable sentence under §3553.

### **THE DEFENDANT**

Mr. Vargas's trajectory from the crime-ridden slums of Medellin in the 1980s was sad but predictable. He was born into poverty on the outskirts of Medellin in 1973. As the anguished letters of his family and friends (Attachment A) show, it was an exceptionally loving and close-knit family, a humble family. His father was a shoemaker, his mother cared for Mr. Vargas and his three siblings. But from the time Mr. Vargas was a young boy, his family lived in fear of Escobar.  The family fled its home when Mr. Vargas was eight, because a close friend of his father had had a disagreement with, and received a threat from, someone in Escobar's cartel.  This sounds fanciful in New York in 2016, but in 1980s Medellin, being a friend of someone whom the Escobar had threatened could be a dire emergency, a matter of life and death.

The Escobar problem recurred when Mr. Vargas was a teenager, still living with his family in comparative safety, in another Medellin neighborhood. His father rented a portion of the family home to a man named Alvaro Taborda. Taborda, who worked for the Galeanos, gave Mr. Vargas errands to run or odd jobs to do, all criminal in nature (deliver a message, watch this house, hold this package) and all handsomely compensated, on the order of $100.[14]  But in 1992, after Escobar killed

---

[14] It was while working for Taborda that the Defendant, still a teenager, met Yiyo for the first time.

the Galeanos and war broke out between Escobar's army and Los Pepes, *i.e.*, Don Berna, Yiyo and other Galeano loyalists, Taborda had to run and hide and, as someone known to have worked for Taborda, so did Mr. Vargas. His parents, likewise, were no longer safe in the house they shared with Taborda, and they fled: his mother moved to Germany; one sister, Patty, left for the United States; his brother, Franklin, his sister, Nora, and his father hid in Bogota. Meanwhile, Taborda picked up Mr. Vargas, and went with him to a Galeano farm. This farm proved to be a barracks and military training camp. Don Berna was there, Yiyo was there, and so were dozens of other young men, drawn from the criminal gangs of Medellin.

Standing alone, this type of adolescence was far from unique in Medellin in the 1980s, and there is a terrible inevitability about the way in which young men raised in those circumstances ended up in criminal gangs, emerging from them either dead or in prison. Modern criminology theorizes that crime is not the consequence of a set number of criminals; rather, criminals are the consequence of a set number of opportunities to commit crimes. (*See* "The City That Became Safe," Franklin Zimring, *Oxford University Press* 2011.) Medellin, Colombia would seem to be the best historical example of this theory. None of this is intended to excuse the crimes Mr. Vargas committed, which were numerous and egregious.  Nevertheless, notwithstanding the statutory command of 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."), federal sentencing in the Guidelines

era is based on a "charge offense," as opposed to a "real offense" mode. (*See* USSG §

1A1.4(a).)  In this case, that means the narcotics trafficking and weapon possession

that he pleaded guilty to under the plea agreement. For those crimes, a 240-month

term of imprisonment is "sufficient, but not greater than necessary" to achieve the

sentencing objectives of §3553, and is the correct sentence.

Finally, I submit that a sentence above the minimum would be procedurally

unreasonable because, I believe, it would be based largely on uncharged acts of prior

violence.   That was not a standard that applied to Don Berna, nor was it applied to

Mr. Tovar-Pupo. Their sentences were based explicitly on extraordinary levels of

narcotics activity, the crime for which they had been extradited. That was so in Don

Berna's case, where the United States Attorney's Office opposed the rights of victim

even to be heard by the Court; and it was also so in Tovar-Pupo's case, in which the

filed, stipulated facts underlying the plea and sentencing guidelines (04 CR 114

(RBW)(D.C.), Doc. No. 221)—which the Government wrote—only talked about

narcotics.  Mr. Vargas is a less culpable trafficker than either, by several orders of

magnitude.  And while it impossible for Mr. Vargas to receive less time than Mr.

Tovar-Pupo, that sentence, two months ago, to 16.5 year term of imprisonment fully

justifies the conclusion I ask your Honor to draw here: that 240 months would be the

appropriate sentence.[15]

---

[15] According to PACER, the Government did not appeal the sentence. But even if it had, the
only issue it could appeal would be the reasonableness of the length of the sentence, not
whether or not the sentencing Court should have considered uncharged violent acts, which
the Government never asked the Court to do. My position before this Court in Mr. Vargas's

**CONCLUSION**

I therefore respectfully ask the Court to sentence Mr. Vargas to 240 months' imprisonment, the mandatory minimum.

Respectfully submitted,

David Wikstrom
Attorney for *Ericson Vargas Cardona*
*Woolworth Building*
233 Broadway, Suite 2208
New York, New York 10279
(212) 248-5511

---

case, therefore, is not whether Tovar-Pupo's sentence should be longer; it is that Mr. Vargas's sentence should be lower than either Don Berna's or Tovar-Pupo's.